**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mathew Horodner, | No. CV-20-01800-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Midwestern University, | |
| Defendant. | |

Pending before the Court is Defendant Midwestern University's Motion for Summary Judgement (Doc. 63). The Court now rules on this motion.

## I.    FACTUAL BACKGROUND

These facts are presented in a light most favorable to the non-moving party or are undisputed. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

Midwestern University (MWU) is a private university that specializes in healthcare education. (Doc. 63 at 2). It offers both masters and doctoral programs. (*Id.*). Its Glendale campus is home to the College of Pharmacy – Glendale (CPG), which offers a three year Pharm.D program for students wishing to become pharmacists. (*Id.*)

In 2017, Plaintiff Matthew Horodner enrolled in the Pharmacy program, beginning his studies that summer (Doc. 27 at 2). Horodner is disabled. (*Id.* at 7). He suffers from a number of disorders, including Asperger's Disorder and reading and comprehension issues. (*Id.*). Pursuant to his rights under the Americans with Disabilities Act, before classes began, Horodner initiated the process to request accommodations from MWU. (*Id.* at 3). The

University handbook and course catalogue lay out the specific requirements and procedures one must go through to get disability accommodations and exceptions from regular academic standards. (Doc. 66 at 1–2). On its first page, the course catalogue notes that MWU "provides equality of opportunity in its educational programs for all persons and maintains nondiscriminatory admissions policies .... " (Doc. 63-2 at 3). It later discusses MWU's compliance with the Americans with Disabilities Act, stating that MWU "makes reasonable accommodations for the physical and mental limitations of students ... to the extent that such accommodation does not impose an undue hardship on the conduct of its business." (*Id.* at 10). Further, it sets out its "In-Progress" grade policy, which gives students up to one quarter to complete a course when there are extenuating circumstances, including illness. (*Id.* at 21). Finally, it discusses its Medical Leave policy, which allows students to take leaves of absence for medical reasons. (*Id.* at 23). The latter two policies give the school discretion as to their application. Additionally, the handbook lays out the process for requesting disability accommodations. (*Id.* at 80). Students must first meet with Student Services and then submit a Request for Accommodations for a Disability Application (RADA) along with documentation of the disability from a healthcare provider. (*Id.*). The Dean of Student Services then meets with the Disability Committee, which determines what accommodations are appropriate. (Doc. 66 at 2). It is undisputed that in making his initial accommodations request, Horodner fully complied with these procedures. (Doc. 66 at 3–4).

Horodner was granted everything he asked for: double time on exams and a low-distraction room to take them in. (*Id.* at 4). He also requested and received bathroom breaks during exams, although he did not submit a new RADA for this request. (*Id.*). These accommodations were further extended to his "Lab Practicals." (Doc. 63 at 5).

Although he received all his requested accommodations, Horodner struggled with Pharmaceutics II (Pharm. II). He received failing grades on his final exam and lab practical, and failed the course as a result. (Doc. 66 at 4). Horodner asked his professor to retake the exam, stating that his disabilities had been exacerbated. (*Id.* at 5). His request, and

subsequent appeal, were both denied. (Doc. 63-2 at 108). Due to his failure, he was placed on academic probation and an extended track, and was made to retake the course. (Doc. 63 at 5–6). To better prepare for the retake, and for subsequent classes, Horodner reached out to the Disability Services Coordinator, Dr. Sesterhenn, to discuss tutoring. (Doc. 66 at 5). No further action was taken by either Horodner or Sesterhenn. (*Id.*). Later, in 2018, as he was preparing to retake Pharm. II, he made a request for additional lab time with an instructor. (Doc. 63 at 6). After a short phone call with the Disability Committee, Sesterhenn denied the request, stating that this was not a disability issue but an academic issue. (*Id.* at 6). Horodner ultimately passed the course. (*Id.* at 7).

Horodner's second major difficulty came when he began taking Integrated Sequence IV (IS-IV). He received a series of low scores on the first three exams. (*Id.* at 8). Then, shortly before the fourth exam, his apartment was burglarized, which he claims exacerbated his symptoms once again. (Doc. 66 at 8). Because of this, he was allowed to take the final exam at a later date. (*Id.*) Even though he received an extension, he failed the final. (*Id.*). He then met with Sesterhenn and other administrators to discuss his options. (*Id.* at 9). Horodner had inadvertently been assigned an "In-Progress" grade for the course, and at the meeting he requested that he be able to take the cumulative retake exam at a later date. (*Id.*). This request was denied. (*Id.*). He also requested and was denied a medical leave (*Id.*). After refusing to sit for the retake on the assigned date, Horodner withdrew from MWU. (*Id.* at 10).

## II.   PROCEDURAL BACKGROUND

On August 21, 2020, Horodner filed suit against Midwestern University in the Arizona Superior Court. (Doc. 1-3). He sought declaratory and injunctive relief, as well as damages, claiming that MWU's failure to accommodate his disability led to his withdrawal from the Pharmacy program. (*Id.*). On September 15, 2020, the case was removed to Federal District Court. (Doc. 1).

On January 21, 2022, MWU moved for summary judgement arguing that Horodner's requested accommodations were unreasonable and would have required a

fundamental alteration of its academic program. (Doc. 63 at 12,14,15). It also asserted that the statements relied on by Horodner for his promissory estoppel claim are too vague. (*Id.* at 15). On February 22, 2022, Horodner filed his response claiming that his requests for accommodations were reasonable and that everything requested was done so pursuant to policies outlined in the student handbook and course catalogue.  (Doc. 66). He also claimed that MWU's policies constituted promises and that MWU's actions led to his reasonable reliance on the "In-Progress" and Medical Leave policies. (*Id.*). On March 9, 2022, Midwestern University filed its Reply in Support of its Motion for Summary Judgement. (Doc. 70).

## III.   LEGAL STANDARD

### a.  Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations ... admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(A-B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of demonstrating to the Court the basis for the motion and the elements of the cause of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* A material fact is any factual issue that may affect the outcome of the case under the governing substantive law. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 248. The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison*, 357 F.3d at 1075.

At the summary judgment stage, the Court's role is to determine whether there is a genuine issue available for trial. There is no issue for trial unless there is sufficient evidence in favor of the non-moving party for a jury to return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 249–50. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted). Notably, in the discrimination context, very little evidence is needed to survive summary judgement "because the ultimate question is one that can only be resolved through a 'searching inquiry'—one that is most appropriately conducted by the factfinder, upon a full record." *Lam v. Univ. of Haw.*, 40 F.3d 1551, 1564 (9th Cir. 1994) (internal citations omitted).

**b. The Americans with Disabilities Act and the Rehabilitation Act**

The ADA and the Rehabilitation Act provide protections to disabled individuals, allowing them to utilize services provided by public accommodations and federally funded entities. The text of Title III of the ADA provides that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the ... services ... , privileges, advantages, or accommodations of any place of public accommodation by any person who ... operates a place of public accommodation." 42 U.S.C. § 12182. It defines discrimination in terms of failing to make "reasonable modifications[,]" unless it can be

shown that making such modifications would "fundamentally alter the nature" of the services provided. 42 U.S.C. § 12182 (b)(2)(A)(ii). Similarly, the Rehabilitation Act states that no disabled individual shall, "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" 29 U.S.C. § 794(a).[1] Because they are so similar, courts apply the same analysis to claims raised under each act. *See Zukle v. Regents of Univ. of Calif.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999). In meeting both Acts' non-discrimination requirements, public accommodations, or federal fund recipients, are only required to make "reasonable" accommodations, not "fundamental" or "substantial" modifications, to their policies and standards. *Alexander v. Choate*, 469 U.S. 287, 300 (1985). This ensures that institutions can preserve the integrity of their programs, while also allowing the disabled to participate. *See id.*

For failure to accommodate claims, four elements must be proven: 1. the plaintiff is a disabled individual under the Acts, 2. he is "otherwise qualified to remain a student at the Medical School, i.e., []he can meet the essential eligibility requirements of the school, with or without reasonable accommodation," 3. he was dismissed solely because of his disability, and 4. The school receives federal financial assistance or is a public entity. *See Zukle*, 166 F.3d at 1045. The burden of proof is not completely on the plaintiff, however. In the failure to accommodate context, a modified burden shifting analysis is applied. The plaintiff has the initial burden of showing that he is otherwise qualified, and that a reasonable accommodation exists that would allow him to meet the institution's "essential eligibility requirements." *Id.* at 1047. Reasonableness is determined on a case-by-case basis and depends on the individual student's particular circumstances. *See id.* at 1050.[2] Once the reasonableness element is shown, the burden shifts to the defendant to show that the requested accommodation would require a "fundamental or substantial modification of its

---

[1] Unlike Title III of the ADA, the Rehabilitation Act only covers situations where disabled individuals are excluded *solely* because of their disability. *See* 29 U.S.C. § 794(a).
[2] Both the burden on the defendant-school and on the plaintiff-student are burdens of production, yet the Ninth Circuit has noted that the student retains the "ultimate burden" of persuading the factfinder that he is "otherwise qualified." *Zukle*, 166 F.3d at 1047.

program or standards." *Id.* at 1047[3] Because institutions are not required to make substantial modifications, or ones that will result in a fundamental alteration of a program, this showing will defeat a failure to accommodate claim. *See id.* at 1049.

This standard analysis changes in the education context, however. As the Ninth Circuit has reiterated, educators and administrators, unlike courts, have unique experience both in determining standards of academic performance and "whether a student 'would meet reasonable standards for academic and professional achievement established by a university'" *Id.* at 1408 (quoting *Doe v. New York Univ.*, 666 F.2d 761 (2d. Cir. 1981)). This unique insight counsels deference in the "fundamental modification" analysis. Thus, a university's evaluation is given great weight in determining whether there was a failure to provide reasonable accommodation. *See id.* Yet, this deference is not absolute. It only applies when the institution has shown that, at the time the decision was made, it took steps that render it worthy of deference. In essence, the Court must ensure that a university is not masking discriminatory requirements as academic standards. *See Wong v. Regents of Univ. of Calif.*, 192 F.3d 807, 817 (9th Cir. 1999) (quoting *Zukle*, 166 F.3d at 1048). Educational institutions, then, have an obligation "to seek suitable means of reasonably accommodating a handicapped person and to submit a factual record indicating that it conscientiously carried out this statutory obligation." *Id.* at 1048 (quoting *Wynne v. Tufts University School of Medicine*, 932 F.3d 19, 25–26 (1st Cir. 1991). Specifically, the institution has a "duty to make itself aware of the nature of the student's disability; to explore alternatives for accommodating the student; and to exercise professional judgment in deciding whether the modifications under consideration would give the student the opportunity to complete the program without fundamentally or substantially modifying the school's standards." *Wong*, 192 F.3d at 818. This must be done at the time the request for accommodation was made. *See id.* If it cannot be shown that the institution went through this process, deference is not warranted.

---

[3] A school may also meet its burden of production by showing that "the requested accommodations, regardless of whether they are reasonable, would not enable the student to meet its academic standards." *Zukle*, 166 F.3d at 1047.

1       **c.  Promissory Estoppel**

2           Under Arizona law, promissory estoppel applies where the defendant has made a

3   promise that the plaintiff actually relied upon, to his detriment, and where it was reasonably

4   foreseeable that the plaintiff would so rely. *See Higginbottom v. State*, 51 P.3d 972, 977

5   (Ariz. Ct. App. 2002); *Contempo Const. Co. v. Mountain States Tel. & Tel. Co.*, 736 P.2d

6   13, 16 (Ariz. Ct. App. 1987). The plaintiff cannot merely choose to rely on a statement.

7   Rather, he must have a "justifiable right to rely" on it. *See Higginbottom*, 51 P.3d at 977

8   (citation omitted). Whether reliance is justified is determined based on the reasonableness

9   of that reliance. *See id.*

10          Before the reasonableness question is reached, however, it must be determined

11  whether there was an actual promise. The asserted promise in a promissory estoppel claim

12  must be real and actual, and not indefinite in its scope. *See School Dist. No. 69 of Maricopa*

13  *Cnty. v. Altherr*, 458 P.2d 537, 544 (Ariz. Ct. App. 1969). There is no promise, and

14  consequently no promissory estoppel claim, if the statement is too vague.

15  **IV.  MWU'S MOTION FOR SUMMARY JUDGEMENT[4]**

16     **A.  ADA and Rehabilitation Act Claims**

17          MWU does not contest the fact that Horodner is a disabled individual for purposes

18  of the ADA or Rehabilitation Act, or that MWU is a place of public accommodation that

19  receives federal funds. (Doc. 63 at 10–11). Its claim is that the requested accommodations

20  are unreasonable and would have resulted in a fundamental alteration of its academic

21  programs. (*Id.* at 11). The real issue is, thus, whether Horodner was otherwise qualified

22  with or without reasonable accommodation.[5]

23  ――――――――――――
    [4] Given that this motion has been pending since January of 2022, the uncertainty
24  surrounding the medical condition of counsel for Plaintiff, and the fact that oral argument
    would not aid this Court's decisional process (*see Partridge v. Reich*, 141 F.3d 920, 926
25  (9th Cir. 1998); *Lake at Las Vegas Investors Group, Inc. v. Pacific. Dev. Malibu Corp.*,
    933 F.2d 724, 729 (9th Cir. 1991)), the Court will decide this motion without oral
26  argument.
    [5] The Court analyzes reasonableness and whether there was a fundamental alteration under
27  the "otherwise qualified" prong. If a student who is given reasonable accommodations can
    make it through the academic program, then he is "otherwise qualified." But, if those
28  accommodations would fundamentally alter that program, and the student can only make
    it through with those accommodations in place, he is not "otherwise qualified." *See Zukle*,
    166 F.3d at 1048.

### a. Deference to MWU

There are two sets of accommodation requests that Horodner is claiming MWU failed to grant in violation of the Acts. First are the three Pharm. II requests: 1. his request for additional lab time, 2. his request for additional time with an instructor, and 3. his request for a tutor.[6] Second are his two IS-IV requests: 1. his request for an extension under the "In-Progress" grade policy and 2. his request for a medical leave. MWU argues that it is entitled to deference in its determination as to both sets.

First, MWU contends that the Disability Committee considered the requests for additional lab time and time with an instructor and determined that granting them would constitute a fundamental alteration of the curriculum. (Doc 63 at 12). It asserts that after Horodner e-mailed Sesterhenn to request the Pharm. II accommodations, Sesterhenn had a conference call with the Disability Committee where it determined that the requested accommodations were not reasonable. (Doc. 63-4 23–24). It also notes that Sesterhenn discussed alternative means of gaining lab experience with Horodner at a meeting in April 2018, including attending office hours, open lab sessions, or undertaking an internship. (Doc. 63. At 12). Unlike the requested accommodations, MWU asserts, these alternatives would not have given Horodner an academic advantage over his peers. (*Id.*). Because MWU undertook this review and considered and offered alternatives, it claims it is entitled to deference. Second, as for the request for a tutor, MWU argues that it only offers small group tutoring sessions for failing students, not for those retaking courses. (Doc. 70 at 9). This, it claims, is due to resource constraints and the desire to benefit failing students in the best way possible. (Doc. 66-2 at 10–11). It also argues that Horodner never put in a formal accommodation request for a tutor, but merely e-mailed about discussing the possibility of a tutor. (Doc. 70 at 9). Thus, it contends, no request was even made.

In response, Horodner states that Sesterhenn's consultation with the Disability Committee lasted only three or four minutes. (Doc. 66 at 6). Further, he claims that he was

---

[6] Horodner also requested to use a laminar flow hood as part of his request for additional lab time. (Doc. 63 at 12). Because this request is connected to his lab time request, they will be analyzed together.

not given the opportunity to submit supporting documentation from a physician or to submit a RADA. (*Id.*) He also claims that the Disability Committee at the time did not discuss any alternatives. (*Id.*). As for his request for a tutor, Horodner claims that he specifically asked for a tutor, pointing to an email in which he asked for a tutor "for courses like IS." (Doc. 66-3 at 36).

Although Horodner does not dispute that the Disability Committee did discuss the specific requests, his evidence regarding the shortness of that discussion raises a question as to whether enough consideration was given. Further, while the e-mails and expressed concerns over resource constraints also show that the tutoring request was considered, Horodner's specific request to discuss tutoring in his e-mail suggests that it is possible that MWU should have treated this more formally.  Applying the *Wong* standard, it is clear that MWU made itself aware of Horodner's disability. It did so when it first received his RADA and supporting documentation (Doc. 63-4). It is not as clear, however, whether alternatives were fully explored or whether the effects on academic standards were fully considered. Thus, there is a genuine dispute as to whether MWU fully undertook its duties regarding its consideration of Horodner's Pharm. II requests.

Regarding the IS-IV accommodations, MWU contends that granting Horodner an indefinite extension of time by giving him an "In-Progress" grade would have fundamentally altered the nature of the curriculum because it would have effectively given Horodner "a second chance to pass the course ... " (Doc. 63 at 14). Because he was already on an extended track, MWU claims, Horodner already had the time necessary to complete his coursework. Thus, giving him an indefinite amount of time, it asserts, would go beyond what it was required to do under the Acts. (*Id.*). Furthermore, MWU claims that this was not even an option at the time because Horodner had failed, and the term was technically over. (*Id.* at 9 citing Doc. 63-1 at 9). As for his request for a medical withdrawal, it asserts that this too amounts to an indefinite extension of the time available to complete a course, and that under its withdrawal policies the only option is to withdraw and reapply. (Doc. 63 at 15; Doc. 70 at 5).

1    Yet Horodner claims that the requested accommodations were available, citing to

2  the "In-Progress" grade policy (Doc. 63-2 at 21) and the Medical Leave policy (*Id.* at 23).

3  He also asserts that MWU has not presented any evidence that suggests administrators at

4  the time "sufficiently investigated and evaluated the plausibility of" his accommodations.

5  (Doc. 66 at 12). He further contends that he simply asked for a short extension to treat his

6  disabilities, (*id.* at 9 citing Doc 66-8 13–14), but that these requests were outright denied.

7  (Doc 66 at 9).

8    While *Wong* requires universities to "exercise professional judgement" in

9  determining whether the proposed accommodation would fundamentally alter their

10  academic standards, this does not necessarily mean that they have to formally consider the

11  issue. *See Wong*, 192 F.3d at 818. It might have been clear to the administrators that this

12  accommodation was not appropriate. That the "In-Progress" and Medical Leave policies

13  were established by the school, however, suggests that application of them is appropriate

14  in certain circumstances and that there is a disputed issue of fact as to whether MWU should

15  have given his request a fuller consideration. Again, there is a genuine dispute as to whether

16  there was enough consideration given by MWU and its administrators as to the IS-IV

17  requests, and as to whether deference is warranted.

18    **b. Pharm. II Claims**

19    Even if there were no dispute as to whether deference is owed to MWU, there is a

20  dispute as to the reasonableness of the accommodations and whether applying them would

21  have resulted in a fundamental alteration of academic standards. As noted above, deference

22  does not mean that the Court leaves the ultimate decision to the school. As the Ninth Circuit

23  has noted, deference "must not impede our obligation to enforce the ADA and the

24  Rehabilitation Act." *Zulke*, 166 F.3d at 1048. Again, the ADA claims and the

25  Rehabilitation Act claims will be analyzed together.

26    MWU claims that the Pharm. II retake accommodations were not reasonable for

27  three reasons: 1. because Horodner did not go through the proper accommodations request

28  process, he did not establish how any of the requested accommodations related to his

- 11 -

disability, (Doc. 63 at 11–12); 2. there were less burdensome alternatives discussed that would have given Horodner the lab experience he needed; and, 3. the accommodations were not necessary because Horodner had previously passed the lab component of Pharm. II, and ultimately passed the entire course when he retook it. (Doc. 63 at 11–13). As shown in Horodner's original RADA documentation, RADAs and accompanying medical information serve as a source of information for MWU that helps it to assess whether the requested accommodations are necessary for compliance with the Acts given a student's unique disabilities. (Doc. 63-4). If this was not available, arguably it would be more difficult for MWU to determine whether the accommodations were reasonable. As MWU notes, Horodner "simply e-mailed his request[s] ... to [the administrators], without identifying how these particular requests related to his disabilities, providing supporting documentation from a provider, or otherwise following any of Midwestern's policies and procedures .... " (Doc. 63 at 12). Additionally, as MWU has shown, Horodner was offered a number of alternatives for gaining lab experience. (Doc. 63-2 at 97). If these were more feasible, particularly given that the Disability Committee had already considered and rejected the requested accommodations, then, as MWU contends, it is possible that the additional lab time and tutor might not have been reasonable under the circumstances. Finally, it is arguable that the accommodations were likely unnecessary given that Horodner passed his retake. *See Zukle*, 166 F.3d at 1050 (noting that student who was denied accommodation of extra time to study for exam was not prejudiced by failure to accommodate because she ultimately passed exam).

MWU also claims that the requests would have fundamentally altered the curriculum. (Doc. 63 at 12). It cites to the conference call that Sesterhenn had with the Disability Committee. On that call, the Disability Committee concluded that the additional labs, and related requests, would put him "at an advantage over his peers" (Doc. 63-3 at 6 citing 63-4 at 23–24). Because Horodner, by retaking the course, would have a second opportunity to do the labs, MWU claims, giving him an additional lab, or additional lab time, would give him an advantage that his fellow classmates did not have. As Sesterhenn

wrote in her e-mail to Horodner after her conference call, the additional lab time was deemed to be an "academic modification" not available to all students. (Doc. 63-4 at 61). There is then some evidence that suggests that MWU understood the Pharm. II requests to constitute fundamental alterations of its academic program.

Horodner counters that he was not given the opportunity to go through the full RADA procedure because Sesterhenn, either on her own, or after little consultation, outright denied his accommodations requests. (Doc. 66 at 5–6). When he e-mailed Sesterhenn to request a tutor, she simply forwarded his request to another administrator, but never responded to Horodner. (Doc. 66 at 5 citing Doc. 66-2 at 12). Further, Horodner presents evidence that tutoring services are available both to failing students and as an accommodation request. (Doc. 63-2 at 27; Doc. 66-2 at 10–11). As noted above, he also claims that Sesterhenn's three or four minute consultation with the Disability Committee, after which Horodner was denied his Pharm. II requests, was insufficient in terms of procedure. (Doc. 66 at 6). Consequently, he maintains that he was denied the ability to go through the formal RADA process. He also argues that there is no evidence that the Disability Committee discussed alternatives. (*Id.*). Additionally, his expert witness opines that such accommodations are often granted at universities. (Doc. 66-7 at 9). Thus, Horodner does present evidence that his requested Pharm II accommodations might not be unreasonable.

He also contends that the alternatives that were made available to him were not feasible. As he required a low distraction environment, he claims that the "open labs" would not have been helpful. (Doc. 66 at 13). Further, he contends that internship opportunities are not sufficient under the Acts, because it is MWU that must make the accommodations. (*Id.*).

Responding to the claim that the accommodations were unnecessary because he initially passed the lab component of Pharm. II and ultimately passed the course, Horodner suggests that, at the time, the request was reasonable because past performance suggests little about how well a student will do on subsequent exams. (*Id.*) (citing *Dean v. Univ. at*

1 *Buffalo Sch. Of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2nd Cir. 2015)).

2     He also disagrees with the Disability Committee's assessment that granting these

3 requests would give him an advantage over his peers. He asserts that because he has a

4 disability he is at a disadvantage, and that this would have leveled the playing field. (Doc.

5 66 at 7 citing Doc. 66-8 at 3). His expert witness will testify that accommodations such as

6 additional lab time are similar to needing extra time on exams. (Doc. 66-9 at 3). Indeed,

7 Horodner offers evidence that previous schools he attended gave him similar access to

8 instructors and additional time for assignments. (Doc. 66 at 8). Ultimately, the evidence

9 presented by Horodner on these claims is enough to create a genuine dispute as to the

10 material facts surrounding the reasonableness and fundamental alteration inquiries for his

11 Pharm. II related claims.

12     **c.   IS-IV Claims**

13     MWU contends that all of the requested accommodations surrounding Horodner's

14 failure of the fourth exam in IS-IV were based around his unsupported claim that his

15 disabilities were exacerbated. (Doc. 70 at 7). It claims that Horodner's only support for his

16 exacerbation claim is his own declaration. (Doc. 70 at 7). Further, it cites to Horodner's

17 original RADA, in which his doctor stated that Horodner did not experience "crisis

18 episodes." (Doc. 63-4 at 40). Thus, MWU claims that it had no notice that his disabilities

19 could be exacerbated or that they were exacerbated in the weeks leading up to the fourth

20 exam. Because of this, it claims that it had no duty to accommodate any issues resulting

21 from the exacerbation because an institution only has a duty to accommodate known

22 disabilities (Doc. 70 at 8) (citing *Hoppe v. College of Notre Dame of Md.*, 835 F.Supp.2d

23 26, 35 (D. Md. 2011).

24     Additionally, MWU asserts that Horodner did not submit a RADA or go through

25 any of the procedures to formally request either an "In-Progress" grade or a medical leave.

26 (Doc. 70 at 10). Horodner's deposition testimony bears this out. (Doc. 66-8 at 13–14).

27 Because there was no formal request, there was no basis upon which to evaluate the

28 reasonableness of the accommodations, MWU asserts (Doc. 63 at 13). It also notes that

despite this, it allowed Horodner to take the fourth exam on the make-up test date. (*Id.* at 13–14). MWU concludes that it is not unreasonable to deny a request that was made without using the proper procedures and for which no supporting documentation was submitted.

MUW also claims that both the request that the "In-Progress" grade policy be applied and for a medical leave amounted to a request for an indefinite extension. (Doc. 63 at 13; Doc. 70 at 10). The ADA does not require MWU to grant infinite time to complete a course, it claims. It cites to *Halpern v. Wake Forest University Health Sciences*, 669 F.3d 454 (4th Cir. 2012) for this proposition. That case involved a medical school student with ADHD who only disclosed his disability and requested accommodations after he had already violated the University's professionalism standards. *See id.* at 465. He requested that he be allowed to stay at the medical school on probation and seek therapy instead of being expelled for his violations. *See id.* at 460. The court held that these accommodations would essentially give him an indefinite time in which to complete the program. *See id.* at 466. They were thus unreasonable and not required by either the ADA or Rehabilitation Act. *See id.*

That a school is not required to give a student an indefinite amount of time seems to be confirmed by the text of the statutes themselves. The Rehabilitation Act uses the phrase "qualified individual," and states that no such individual with a disability shall be "excluded from participation in" any program or activity receiving federal funds. 29 U.S.C. §794. Thus, the accommodations provided by the entity must render the disabled individual qualified to participate at the moment they are implemented or shortly thereafter. The accommodations must lead to participation. If the accommodations merely create the possibility that sometime in the future the individual might be able to participate, then they would not lead to participation and would seemingly not be required under the Act. Similarly, the ADA speaks of modifications that are "*necessary to afford* such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities .... " 42 U.S.C. §12182 (emphasis added). "Necessity" suggests the same idea

that such modifications, when implemented, will almost immediately allow the disabled individual to partake of the goods or services being offered by the covered entity. The Acts do not require accommodations that would allow disabled individuals to *attempt* to participate, but only ones that actually allow them to participate. Thus, an educational institution does not have to implement accommodations that grant an individual an indefinite time to complete its academic programs. The possibility of them becoming otherwise qualified is too remote. As MWU has argued, doing so would be equivalent to giving Horodner "a second chance to pass the course, rather than providing him with an equal opportunity." (Doc. 63 at 14).

Finally, MWU claims that Horodner did not request a medical withdrawal, and that even if he did, the University does not recognize special categories of withdrawal, so the outcome would have been the same. (Doc. 63 at 14–15). It is true that while MWU does have a "Medical Leave" policy (Doc 63-2 at 23), it only recognizes one form of withdrawal, which results in being dropped from the rolls and having to reapply. (*Id.* at 25).

Horodner responds that he did relate to the school that his disability was exacerbated before the fourth exam for IS-IV. (Doc. 66 at 14). He points to an email to his teacher in which he discussed the fact that he was going through "emotional turmoil" and needed some time to "gather myself mentally[.]" (Doc 63-2 at 138). This e-mail was also forwarded to another administrator who helped to coordinate his taking of the fourth exam on the make-up date. (*Id.* at 136–37). Furthermore, he states that he was not able to submit a RADA or initiate the accommodations request process, because Sesterhenn "made it clear ... that his request for an extension would be denied." (Doc. 66 at 9) (citing Doc. 66-8 at 13). Horodner has presented evidence, then, that MWU seemingly did not let Horodner go through the proper procedure.

Responding to the assertion that an indefinite leave is unreasonable, Horodner counters that he never requested an indefinite leave. (Doc. 66 at 14). Rather, he claims that he merely requested a "limited extension" or a medical withdrawal. (*Id.* at 14–15). A short extension, defined by the time it would take him to recover from his exacerbation and

return to school, is eminently reasonable, he claims. (Doc. 66 at 15). That he only wanted to take a short leave is suggested by the emails he exchanged with administrators regarding taking a medical leave. When asking about a medical withdrawal, Horodner asked if the soonest he would be able to re-enroll would be "around this quarter next year." (Doc. 63-2 at 141). This is evidence that he only wanted a short leave to recuperate. Horodner further notes that allowing students to postpone exams to recover from illness is quite common, and that he had previously received extensions in the past. (Doc. 66 at 15).

Additionally, this situation seems to be distinct from the situation in *Halpern* in that Horodner is claiming that he requested that two explicit policies be applied, rather than that he receive unique accommodations. The plaintiff in *Halpern* had requested a number of specific accommodations that the court deemed to effectively constitute an indefinite extension of the time he had to complete the program. Horodner asserts that he was not suggesting accommodations unique to his disability that are not available to others, but rather requesting that certain specified policies be applied to him because of his exacerbated disabilities. As these policies are available to the general student body, and themselves contemplate lengthy extensions of time before a student completes a course, there is a disputed issue of fact as to whether he was requesting an indefinite extension, which would not be required under the Acts, or making a reasonable request to have specific and generally applicable policies applied to him in light of his disabilities.

Finally, Horodner contends that when requesting a medical withdrawal, he was in fact requesting a medical leave pursuant to the stated Medical Leave policy as an accommodation. This policy allows students who "become seriously ill" to request a leave. (Doc 63-2 at 23). The length of the leave "depends on the severity of the illness." (*Id.*). Unlike a withdrawal, a medical leave, if granted, would have allowed him to recover and return. (Doc. 66 at 16). Given this, this Court finds Horodner has presented enough evidence to create a disputed issue for trial on the IS-IV claims.

**B. <u>Promissory Estoppel</u>**

MWU's two main contentions are: 1. that promissory estoppel does not apply

1    because the statements Horodner cites are too vague; and 2. that there is no connection

2    between these statements and Horodner's decision to enroll or his failing to graduate. The

3    statements from the student handbook and course catalogue, MWU claims, are general

4    statements of policy and practice that are not explicit promises. (Doc. 63 at 15–16). Thus,

5    it contends, there is no promise that Horodner can claim to have relied on. (*Id.* at 16).

6    Additionally, it maintains that there is no evidence suggesting that Horodner enrolled at

7    MWU because of the policies or that the University's decision not to apply them led to his

8    failure to get a degree. (*Id.*). Horodner counters by stating that the policies are clear and

9    include detailed language. (Doc. 66 at 17). Further, he asserts that most of them are non-

10   discretionary. (*Id.*). In regard to the policies that are discretionary, Horodner maintains that

11   MWU took steps to induce him to believe those policies would be applied. (*Id.*). The Court

12   can decide this claim on vagueness grounds. Therefore, this Court will not address MWU's

13   argument regarding the lack of connection between the policies and Horodner's injuries.

14        **a.  Lack of a Clear Promise**

15        There are four policies that Horodner claims constitute promises: 1. the equal

16   opportunities for all statement, 2. the ADA statement and related policies, 3. the Medical

17   Leave policy, and 4. the "In-Progress" grade policy. (Doc. 66 at 17). MWU argues that

18   these are merely general statements of policy and not affirmative promises. (Doc. 63 at 15).

19   Statements such as MWU "provides equality of opportunity" (Doc. 63-2 at 9), or that it

20   "maintains a policy of nondiscrimination" (*Id.* at 10), are vague generalizations concerning

21   MWU's standards, it contends. (Doc. 66 at 17). Furthermore, it states that its Medical

22   Leave and "In-Progress" grade policies give the University significant discretion to

23   determine whether they are appropriate in a given circumstance. (*Id.* at 16). Therefore,

24   MWU claims, none of the four policies can constitute a specific enough promise for

25   purposes of promissory estoppel. Horodner counters that the policies are specific because

26   they use clear and unequivocal language. He points to the words "provides" and "makes"

27   in the equal opportunities and ADA statements to show that MWU has no discretion as to

28   whether to apply these policies. (Doc. 66 at 17). He also points to the "Rights and

Responsibilities" section of the ADA policy from the student handbook to show that these policies are detailed. (*Id.*). Thus, he claims they convey promissory intent. (*Id.*). As for the discretionary nature of the "In-Progress" grade policy, he claims that because he was inadvertently assigned an "In-Progress" grade, he was justified in believing that the University had chosen to apply the policy to him and that he was entitled to its benefits. (*Id.*). He also claims that he had the right to rely on the Medical Leave policy because testimony from the Associate Dean establishes that "all students who request medical withdrawals are granted them." (*Id.*). Thus, he contends, it was effectively a matter of custom that all medical leave requests are granted and consequently his reliance was justified.

Horodner's arguments here are unavailing. For any promissory estoppel claim "the plaintiff must allege that a promise was made." *Johnson Intern., Inc. v. City of Phoenix*, 967 P.2d 607, 615 (Ariz. Ct. App. 1998). Arizona uses the Second Restatement approach in assessing promissory estoppel claims. *See Chewing v. Palmer*, 650 P.2d 438, 440 (Ariz. 1982). The Second Restatement defines a promise as "a manifestation of intention to act or refrain from acting in a specified way…." Restatement (2d) of Contracts, §2 (1981). Thus, a promissory estoppel claim must rest "upon a promise to do something in the future" where the promisor intended to follow through. *Trollope v. Koerner*, 470 P.2d 91, 98–99 (Ariz. 1970). The equal opportunities statement and the ADA statement are vague. That MWU "provides equality of opportunity" tells students nothing about what this means or how it is undertaken. The same is true of the ADA statement. Further, the "Rights and Responsibilities" section of the ADA compliance portion of the handbook gives the University a large amount of discretion as to whether to grant an accommodation. For example, one "responsibility" of the University is to provide "reasonable and appropriate accommodations, academic adjustments, and/or auxiliary aids following a timely request." (Doc. 63-4 at 7). While this does give a bit more insight into the policy, it grants MWU discretion as to reasonableness and appropriateness. One of the University's "rights" is the authority to refuse to give accommodations in certain circumstances. Clearly, then, it has

a wide amount of discretion. Another section gives students the "right" to "[e]qual access to courses…" (*Id.*). But this vague statement does nothing to clarify the other vague language in the ADA statement. Indeed, the statements cited are equivalent to other general statements in the course catalogue such as "Midwestern University will provide a safe and healthy environment…" (Doc. 63-2 at 8). What this means or entails is an open question. These statements lack the promissory intent necessary to form a basis for a promissory estoppel claim.

Horodner's claim also fails in regard to the "In-Progress" grade policy and the Medical Leave policy. Although he was inadvertently assigned an "In-Progress" grade, for the purposes of promissory intent in the context of a promissory estoppel claim it was not reasonable for him to rely on this as indicating that the policy was being applied to him. In order to for this policy to apply, it must be authorized by the Dean. He has discretion as to this decision, and application is not guaranteed. (Doc. 63-2 at 21). Horodner never made such a request to the Dean. Thus, it would not make sense for him to have relied on it even if his grade was inadvertently marked "In-Progress." The Medical Leave policy, as set forth in the handbook, is also entirely discretionary. Thus, there is no valid basis for claiming promissory intent. Students requesting a medical leave must do so in a letter to the Dean. (*Id.* at 23). The Dean must then consider the request and the surrounding circumstances. (*Id.*). A medical leave, thus, is not guaranteed in all situations. Unlike Horodner's Medical Leave related claim under the ADA and Rehabilitation Act, which is based on his assertion that his disabilities were exacerbated, this promissory estoppel claim is based on the mere existence of the Medical Leave policy. Yet a promissory estoppel claim cannot rely on a completely discretionary policy or on a statement made in deposition testimony that medical leaves are always granted. Thus, the wide amounts of discretion that MWU has over both policies means that they are not enforceable promises for purposes of promissory estoppel.

Additionally, it should be noted that on the front page of the course catalogue MWU states that it "reserves the right to make changes in any or all specifications contained

herein…" and that "[n]o contractual rights between Midwestern University and any student are intended and none may be deemed to be created by issuance of this catalogue" (Doc. 63-2 at 3). Although this is not a breach of contract claim, this clearly indicates that there was no intention on the part of MWU to promise anything. MWU reiterates this "right to change" in detail later in the catalogue, stating that MWU has the right to change any of its policies without notice. (*Id.* at 10). Because of the lack of promissory intent, there is no promise on which Horodner can base his promissory estoppel claim.

## V.     CONCLUSION

Accordingly,

**IT IS ORDERED THAT** MWU's Motion for Summary Judgement (Doc. 63) is **GRANTED** in part and **DENIED** in part, as set forth above.

**IT IS FURTHER ORDERED THAT** an order regarding the final pretrial conference and trial will follow. And that the Joint Motion to Reschedule Oral Argument (Doc. 72) is **DENIED**.

Dated this 21st day of September, 2022.

James A. Teilborg
Senior United States District Judge